Freeman, J.,
delivered the opinion of the court:
This is a hill filed in chancery court of Wilson county to have a sale and conveyance of a tract of land declared void, together with some personal property sold at the same time.
The ground on which this relief is sought, so far as the hill charges facts on which to base its prayer, are, that the sale of the land, and other property, was made under compulsion, and brought about through the fraudulent conduct of the defendant; that this compulsion was brought to hear on complainant, Hamilton, by the contrivance and arrange^ment of the defendant, in procuring a certain set of armed men, claiming to be Confederate soldiers, to go complainant’s house, rob him, and threaten his life unless he would leave the country within a certain time specified, and in addition to this, that there was a failure on the part of defendant to comply with a condition, or term, of the contract to remove complainant south, or to a place of safety, where he could invest the price of the property sold in a home that would suit him, and further, that the consideration was grossly inadequate at this time, and pal'd in Confederate money, which was forced on the complainant by the threats of the parties referred to, through the agency and procurement of defendant.
The hill charges that complainant was in great fear and terror for his life if he remained in W ilson county, brought on him by the threats of the parties referred to him above, and that complainant, under their influence, importuned defendant to take all his property, give him Confederate money for it, and quickly carry him to the promised place of safety; that he was driven to make this, trade by his great fear, which was well grounded; but that after the *791 trade, he called on defendant to execute the remaining part of his contract, and carry him to a place of safety, where he could invest his money in land, hut the defendant replied that now he had sold his land there was not the least danger from those who had, up to the trade, been threatening his life, and declined to move him, as agreed upon.
He states that after the trade he continued to reside in the same neighborhood unmolested, with a little exception, up to the time of filing this bill, in 1866.
These are the material allegations of the hill. There is a large amount of argument contained in it — much of the history of the country at the time — a'rather pathetic story of the complainant’s situation at the time of the trade, together with a very attractive picture of his quiet,.unobtrusive habits, his devotion to the pursuits of agriculture, and total abstinence from the arena of political strife, “neither preaching secession or talking for the Union,” however, letting us understand pretty distinctly that he was “well satisfied with the government under which he was born.” We need not further notice this statement, however, except to remark that they can have no influence in the decision of the cause, either for or against complainant.
The defendant, in his answer, denies all the allegations of material facts stated in the bill. The answer, however, is not sworn to, that being waived, therefore' it only makes an issue between the parties, but is not evidence for respondent. We may say, however, that, while there are some things stated in the answer that are not precisely sustained by the proof, its statements, in the main, are consistent and reasonable, and give an explanation of the facts of the case, which the proof shows to be very nearly correct, if not strictly so.
We cannot undertake to set out the mass of evidence in detail found in this voluminous record. We only give the conclusions we have come to from careful sifting of *792 the facts, 'witli sucli a summary of the facts as we deem necessary to support these conclusions.
The proof shows that about the 1st of February, 1863, a certain "Wash Puckett was at the house of complainant, in his absence, and that one Whitehead came in while Puckett was there; that both were armed, and professed to be southern soldiers, but really belonged to- that class developed during o-ur late civil strife, who- showed their gallantry by robbing their neighbors indiscriminately. At any rate, they were men of bad character. Whitehead, it seems, robbed the complainant’s house, and threatened that if Hamilton did not leave the country he should be killed.
There is no- positive evidence that this man and Puckett had met there by consent, o-r had any previous connection with each other. However, it is probable that they were on good terms, and certainly they both belonged to- the class described. Hamilton, learning of these threats, and, no doubt, under serious, apprehensions, left hisi home and hid out in the woods near by, getting some of his neighbors to stay with him, having communication daily with his friends, especially one Christopher, who- seems to have been his stepson. There seems to- have been no- real danger to the'complainant, but we are satisfied that his fe-ars- were greatly excited, for while the proof shows him not to have been the “quiet, unobtrusive, peaceful man lie represents himself,” on the contrary, rather a blustering, drunken character, of low order of morals, still we think it also shows him to have been, sincerely [cowardly] and easily alarmed.
While lying out in the woods complainant sent for defendant, Saunders, in order to sell him his land. His stepson, Christopher, was the bearer of tire message, who seems to have failed to- find Saunders the first time he went for him, but on tire second trip, did meet him, and told him that Hamilton told him that Hamilton wished to sell him his land. It seems that Saunde-rs did not, at first, wish to *793 purchase, but consulted, probably, with some one of his neighbors about it. However, he told Christopher that he would buy the land, and give in payment Confederate money. Soon after this he went, with several other neighbors, to where the complainant was in the woods, and then they agreed upon a sale of the land, and then fixed upon a place, at the house of a neighbor, where they should meet and complete the trade by execution of deed. This meeting took place, the deed was executed, the price of various articles of personal property on the place agreed on, and the money paid for said property.
Soon after this Hamilton’s fears seem to have subsided, and ha lived peacefully and quietly in the neighborhood until, as stated, the filing of this bill.
The first ground on which relief is sought in the case is, that the threats, were made against the life of Hamilton by parties in the interest of defendant, and as a part of a plan to buy his land for Confederate money.
We have looked carefully into all this mass of testimony, but the proof totally fails to show any such combination, or, in fact, anything that even indicates the slightest complicity on the part of Saunders with the parties wlm had threatened his life. On the contrary, it is clearly shown that Saunders had been absent in the South on a trading expedition for three or four months, and only arrived at home about the last of January or 1st of February, and not a syllable of testimony to show that he had ever had any communication with these parties, of any kind, after his arrival at home and before the trade was made, and we add, in all the proof, there is no witness who proves a single fact on which the charge of combination between Saunders and the parties threatening Hamilton can be fairly inferred.
The proof shows, satisfactorily, that Hamilton sent for Saunders himself to sell him his land; that he did so. because Saunders, as he thought, had the money to pay him, and *794 be sold for Confederate money because bis purpose was to move further south, where that was the currency of the country.
As .to the question earnestly pressed by counsel, and made in bill, that defendant refused to> move complainant south, the simple answer to it all is that wa do not think it is shown, in the first place, to have been any part of the contract for sale of the land; that complainant wanted to move south is clear; that defendant proposed to move him, after the trade, we think equally true, and that the complainant promised, and was willing to pay him, in the language of a witness, “well for doing so,” the proof shows, but the fact that he was to pay him for moving him excludes the idea that he was already paid in the land and personal property, or that Saunders owed this duty to him by virtue of a contract only a few minutes before completed.
In next place, we see no evidence that complainant ever called on defendant to' remove him south, and even if defendant had contracted to remove him, he could not do so, unless complainant was willing to go. ¥e are well satisfied that no refusal to remove him was ever made by Saunders, and, therefore, he was in no default.
Was there a valuable consideration for the contract, or was it so inadequate as to shock the conscience, and be evidence of fraud or undue and inequitable advantage, so as to entitle Hamilton to relief on this ground?
This question is hardly raised with sufficient distinctness by complainant’s bill to call for a decision of it, yet as it has been earnestly pressed by counsel, we have examined it.
The proof shows by a preponderance of the evidence, to say the least of it, that the amount paid per acre for the land at the time was its fair market value. It is true it was paid in Confederate money, but the proof is equally clear* that this was about all the money in circulation at the time in the country where the trade was made, and that it passed current in all the- transactions of the country at the time. *795 We cannot say that it was not valuable at the time, nor be influenced now by the fact that it has grown to be entirely worthless as the result of the war. Besides, as'we know, it was a currency the credit of which depended greatly upon the sentiments and opinions of men at the time, and its circulation was largely affected by the political opinion of the community where the transaction took place in which it was sought to be used as money.
The following principles, as laid down by Mr. Story, 1 Sto. Eq. Jur., 244, 245, lay down the sound rule on this subject to be deduced from the. many cases in which the question has been discussed by the courts:
“Mere inadequacy of price, or any other inequality in the bargain is not, however, to be understood as constituting, per se>, a ground to avoid a bargain in equity. Eor courts of equity, as well as courts of law, act upon the ground that every person who is not, from his peculiar condition or circumstances, under disability, is entitled to dispose of his property in such manner and upon such terms as he chooses, and whether his bargains are wise and discreet, or profitable and unprofitable, or otherwise, are considerations, not for the courts of justice, but for the party himself to deliberate, upon.
“Inadequacy of consideration is not, then, of itself, a distinct principle of relief in equity. The common law knows no such principle. The consideration, be it more or less, supports the contract. Common sense'knows no such principle. The value of a thing is what it will produce, and admits of no precise standard. It 'must be, in its nature, fluctuating, and will depend on ten thousand different circumstances. One man, in the disposal of his property, may sell it for less than another would. He may sell it under a pressure of circumstances, which may induce him to part with it at a particular time. If courts of equity were to unravel all these transactions they would throw everything into confusion, and set afloat the contracts of *796 mankind.. Sticli a consequence would, of itself, be sufficient to show tlie inconvenience and impracticability, if not the injustice, of adopting the doctrine that mere inadequacy of consideration should form a distinct ground for relief.
“Still, however,” says the learned author, “there may be such an unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition, or some undue influence, and in such cases courts of equity ought to- interfere, upon the satisfactory ground of fraud. But, then, such unconscionableness or inadequacy should be made out as. would (to use an expressive phrase) shock the conscience, and amount, in itself, to conclusive and decisive evidence of fraud.” [1 Sto'. Eq. Jur., sec. 246.]
Tested by these rules, we can find nothing in this record on which the complainant can obtain the relief which he seeks in his bill.
The proof not only shows that the amount paid, per acre, for the land was about its reasonable value, but that the complainant might, at the time., have purchased other lands in the county at fair prices with said money, but failed or refused to do so. He seems simply to have sold out in pursuance of a purpose hastily formed, to remove south. Harassed and alarmed by the threats he had heard had been made by the parties who had robbed his house, he had determined to quit the country, but after the sale, finding that he was unharmed, be. hesitated, waited, and delayed till at last he concluded to remain where he was, and did so. Under the changed state of things at the end of the war, the money having become useless, and influenced, no doubt, by the current of legal opinion for a time, that a contract tainted by Confederate money would always be set aside, he has filed this bill. We cannot yield to this view of the case, and he must abide by his, a may be hasty, but certainly voluntary act.
There is another ground . on which the complainant *797 would be repelled by a court of equity from the relief-he seeks.
He quietly remained in the country, living openly and unmolested from the time of the trade in February, 1863. His fears had long' since passed away, and no kind of re^ straint was ut> on him. He knew every fact connected with the transaction, knew what kind of money he had received, and under what circumstances it had been taken, and assuming the facts to have been as stated in his bill, it was his duty to' have disaffirmed the contract as soon as the fraud was discovered, or, at any ratei, within a reasonable time after its discovery; and, if duress had influenced him, then as soon, or within a reasonable time after' the circumstances of restraint were removed, and he was free to act, he should have notified the defendant of his disaffirmance of the contract, and tendered the consideration back, in order to give the defendant a chance to rescind the contract, be placed in the position he was before the trade, and a chance to have made such investment and use of the Confederate money as the circumstances would have permitted. It would be the most manifest injustice to hold that a party could be allowed to sit by for three years and take the chances of the result of the great civil strife then upon the country, upon which the value of the Confederate money, upon its face, ultimately depended, and when that result proved unfavorable, and the money worthless, come forward and claim to be restored to the possession of his property, he being,.at the same time, totally unable to make the defendant whole. At any rate, in such a case, the party would, at all times, be compelled to account strictly for the value of the Confederate money at the time received before his contract would be rescinded, as well as to give a good reason for the delay, even though it should be shown to have been obtained by the grossest fraud.
The rule is correctly stated by Mr. Story, in his work on *798 Contracts, as follows: “It is solely at the option of the party defrauded, whether he will be bound by the agreement or not, yet, if he determined to avoid a contract because of the fraud, he must give notice of such determination to the other party, within a reasonable time after bis discovery o-f the fraud. And if, with knowledge of the fraud, he acquiesces in the contract expressly, or bring an action on the contract, or do any act importing an intention to stand by it, or remain silent under circumstances which plainly indicate a continuing assent thereto, he cannot afterwards avoid it, for, practically, no man is injured, if he knew of the deceit which is practiced, and consent to it, since the deceit becomes then an agreed fact of the case.” Yol. 1, sec. 497.
In the latter part of the same section it is said: “But so long as ha remains in ignorance that hei was defrauded, his conduct will not be considered as importing such an acquiescence therein as to deprive him of taking advantage of the fraud within reasonable time after his actual discovery thereof. Lapse of time, however, always constitutes an objection to the maintenance of a suit. 'Since the fact that a long time has passed without complaint, or perception of injury, would indicate an absence of fraud, and still greater weight would be given thereto if it should appear to have operated to obscure or destroy the evidence in rebuttal of fraud, or greatly to change the circumstances of the case. But, if, in addition to the lapse of time, the party claiming to recover had the means of knowledge, he must plainly show that he has not been guilty of laches, or he cannot recover.”
These principles are fairly applicable to this case, and would be decisive of it, even though the fraudulent advantage alleged in the bill had been made out.
It is insisted, however, that the party is excused from an earlier disaffirmance of the contract because he continued *799 under the duress of fear, produced by the threats of the parties mentioned in the bill, until the end of the war.
The facts in the record, however, do' not sustain this assumption; on the contrary, very clearly disprove it. In fact, as we have previously indicated in this opinion, there never were any threats made against the party that could, under the facts of the case, have avoided this contract with defendant. No threats were ever made to induce the party to malee this conveyance, or, so far as we can see, ever purposed to attain that end.
“In all cases of duress the threatening or imprisonment must, of course, be the. alternative held out by the other party to the end of enforcing the maldng of the contract.” Story on Contracts, vol. 1, sec. 403.
This -rule thus laid down is a sound one, and under the facts in this record, would preclude the defendant from the relief sought in the bill.
Complainant has brought into court, or proposes to do so in his bill, the Confederate money said to be the same money. This bringing of the money into court in the case of Confederate money was unnecessary, as it is now, by change of circumstances, utterly valueless, except as showing the fund to bo still in his hands, and not to' have been used by the party, when it is shown by proof to be the same money, with reasonable certainty. The general rule, however, is, that before a party can rescind a contract and recover the advances he may have made thereon, he must restore the other to the condition in which he stood before the contract was made; but in cases of fraud, where the subject-matter of the contract has become so entangled and complicated as to render it impossible to do this, the injured party, upon offering to restore the property received, and reinstate the other party into its previous condition, as fax as it lies in his power, may rescind the contract and recover his advances.
The rule is more distinctly stated in Masson v. Bovet, 1 *800 Denio R., 69, that “the party wbo would disaffirm a fraudulent contract must return, whatever lie has received upon it”.” If, however, he is prevented by act of the other party from doing so, this would excuse him. Yet, on any sound principle, if he is rendered unable to make, the party whole by restoring what he has received under the contract, by his own laches and delay in disaffirmance of the contract, he cannot take advantage of bis own wrong to excuse, himself from the performance of this requirement of the law.
AVe have discussed this case more at length than is desirable in an opinion, but have felt bound to do so from the great earnestness with which the very able counsel of complainant have pressed for an affirmance of the decree of the chancellor. As we feel constrained to- reverse that decree, we have gone more, at length with the reasons for our judgment than we would otherwise have done.
The chancellor having decreed a rescission of the contract, we reverse his decree and dismiss complainant’s bill. Complainant, and his sureties for prosecution of his suit, will pay the costs of court below, and he. and his sureties for the appeal will pay the costs of this court.